IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSALIND THERESA BROWN          :          CIVIL ACTION
                                :
          v.                    :
                                :
MICHAEL J. ASTRUE               :          NO. 09-1960

<u>MEMORANDUM</u>

Dalzell, J.                                April 15, 2011

        Plaintiff Rosalind Theresa Brown ("Brown") challenges

the denial of her claim for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-

1383c, by Michael J. Astrue, Commissioner of the Social Security

Administration ("the Commissioner").

        Brown originally filed her claim on October 16, 2006,

asserting that a variety of ailments -- including left upper

extremity ulnar neuropathy, degenerative joint disease in her

right foot and left knee, left rotator cuff tear, degenerative

arthritis of her left ankle and right elbow, and a history of

bowel resection for diverticulitis -- left her unable to engage

in any substantial gainful activity.  Following a hearing, an

Administrative Law Judge ("ALJ") denied Brown's claim on November

30, 2007, and the Appeals Council then denied her request for

review of this denial on December 23, 2008 and again on March 6,

2009 (after the submission of additional information), thus

converting the ALJ's decision into the final decision of the Commissioner.

Brown exercised her right to review of this decision by filing a complaint before this Court pursuant to 42 U.S.C. § 405(g) on May 12, 2009. Brown filed a motion for summary judgment in this matter on August 18, 2009, to which the Commissioner filed a response a month later; Brown then filed a reply to this response.

We referred this case to Magistrate Judge L. Felipe Restrepo for a Report and Recommendation. Judge Restrepo issued his Report and Recommendation on November 30, 2010, recommending that Brown's motion for summary judgment be denied. Brown timely filed objections to Judge Restrepo's Report and Recommendation, contending that Judge Restrepo did not recognize that (1) the ALJ failed to support his credibility finding and (2) the ALJ's residual functional capacity ("RFC") determination was deficient.

Upon review of Judge Restrepo's Report and Recommendation, we find that both of Brown's objections have merit. We will consequently adopt Judge Restrepo's Report and Recommendation only in part, grant Brown's motion for summary judgment in part, and remand this matter to the Commissioner.

## I.  **Factual Background**

Brown was born on March 12, 1951, R. at 17, and completed tenth grade in 1967 and then six months of small business training in 2000.  After a work history including stints as a fixed site office coordinator, security guard at a homeless shelter, and sales clerk at a gas station, id. at 21, Brown stopped working in either 2002 or 2004 to take care of ill family members.  Brown confirms that she did not stop working due to disability.  Id.  Brown earned between $11,000 and $13,000 per year as an office coordinator, but less than $6,500 per year in the latter two positions.  Id. at 22-23.

Brown had surgery for diverticulitis[1] in March of 2004, which allegedly led to nerve neuropathy[2] in her upper extremities that limits "movements of the hand" and causes "numbness."  Id. at 32.  Brown also suffered a tear to her left rotator cuff, resulting in "numbness . . . from the shoulder all the way down

---

[1] Diverticulitis: "inflammation of a diverticulum, especially inflammation related to colonic diverticula, which may undergo perforation with abscess formation.  Sometimes called left-sided or L-sided appendicitis."  Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary 197 (Supp. 1992) (emphasis in original).

[2] Neuropathy: "a general term denoting functional disturbances and/or pathological changes in the peripheral nervous system."  Sloane, supra note 1, at 375.

to the fingers." Id. at 32-33. In her lower extremities, Brown

asserts that (a) she has "two pieces of bone that have been

broken, two spurs and severe arthritis" in her left foot, (b) her

left "knee is totally gone" -- apparently a reference to

degenerative arthritis -- and (c) a Baker's cyst[3] in her right

knee gives her "shooting pain." Id. at 33. Brown also states

that her right "toe, has a nerve neuropathy," and that "the pain

shoots from the big toe through the whole foot." Id. at 34.

Brown testified that she shares a two-story home with

her mother where she lives in the basement and climbs stairs

"about twice a day, maybe, just for my meals." Id. at 35. She

sleeps about thirteen hours each day because "[t]he medication

makes me sleepy,"[4] id. at 37, and remains groggy in the morning

for "[m]aybe three hours before I really feel normal again." Id.

at 46. Brown spends most of her day "[s]itting there watching

TV," id. at 38, though she actually alternates sitting and lying

---

[3] Baker's cyst: "a swelling behind the knee that is
composed of a membrane-lined sac filled with synovial fluid and
is associated with certain joint disorders (as arthritis)."
Medline Plus Medical Dictionary, U.S. Dep't of Health & Human
Servs., http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

[4] Brown testified that she takes at least six
medications: a sleeping pill, "Paxil for depression," two muscle
relaxers -- Percocet and Amitriptyline -- and Oxycodone and
Darvocets, for pain. R. at 48-49.

in her bed.  Id. at 47.  She admits that no doctor has ever recommended that she remain confined to bed.  Id. at 48.  Brown has worn adult diapers since about April of 2006, id. at 32, and testified that she urinates every half-hour and moves her bowels four or five times per day.  Id. at 46.

While Brown has, in her life, washed dishes, done laundry, gone grocery shopping, and vacuumed carpets, she no longer does any of these activities.  Id. at 38-43.  Brown does not wash "the glass dishes anymore, because I have dropped them," id. at 50.  She does not do laundry because "[w]hen it's too heavy like that, I can't lift it," id. at 41.  She does not shop for groceries "[b]ecause I can't really hold things in my hands well," id.; and she does not vacuum because she is not able to do so and doesn't "even try anymore."  Id. at 43.  Instead, Brown's niece helps her with these tasks.  Id. at 38.  Brown cooks for herself to the extent that she "use[s] microwaveable meals."  Id. at 40.  Brown concedes that she is able to manipulate buttons and zippers and articles of clothing "if I have to," though "[i]t takes a while."  Id. at 42.  Brown testified that she prefers to wear clothing that she can pull over her head, "us[ing] the right arm to put something over my head" and "then slide the arm in on

the other side," so that "I don't have to worry about the buttons." Id. at 52-53.

Brown claims that she had been using a cane for about three years as of her hearing on October 2, 2007; according to Brown, her doctor gave her "a prescription for a cane and I couldn't get the prescription filled, because the places that I went to wouldn't do it. So I, I bought the, my own cane." Id. at 34. Brown also wears a foot brace, an arm brace, and an elbow brace; the latter two "weren't prescribed," but she wears them because "they make me feel better." Id. at 54-55. Despite these aids, Brown states that she can only walk "three blocks, four blocks at the most," and that she can remain standing for "half-an-hour, 45 minutes before the pain and I have to sit." Id. at 36. Brown explains that she can sit for "[m]aybe about two, three hours and, you know, then I'll lay down." Id. Brown can lift a gallon of milk, which suggests that she can lift about eight pounds, id. at 37, but she asserts that when she lifts such an object "it's hard to hold it." Id. at 50.

Brown testified that she uses public transportation, id. at 35, and attends church "once every three months." Id. at 44. While Brown is not married, she has had a boyfriend for six

6

years and visits him "two, three days out of a week"; during these visits, they "sit home and watch movies." Id. at 43-44.

On a scale of zero to ten, "zero representing no pain and ten representing pain so excruciating you can't get out of . . . bed," Brown grades her pain in her hands and arm to be an eight; in her ankle, a seven; in her left knee, a ten; in her right knee, a five; and in her right foot, a five. Id. at 56-57.

Seven doctors submitted reports evaluating Brown's physical condition: Craig Israelite, M.D.; Matthew L. Ramsey, M.D.; Raul Yankelevich, M.D.; Michael S. Downey, D.P.M.; David J. Bozentka, M.D.; John Rombeau, M.D; and Bronell Chandler, M.D.. On August 16, 2006, Dr. Israelite examined Brown and recorded that X-rays revealed "significant medial joint DJD [degenerative joint disease] with joint space narrowing of her left knee," and also noted that Brown had "a Baker's cyst of the contralateral knee." Id. at 243. Israelite recorded Brown's reports of left knee pain and "numbness down her foot, particularly with sitting for prolonged periods of times [sic]." Id. On October 19, 2006, Israelite reported that Brown described "moderate symptoms of osteoarthritis and pain symptoms" and was "only able to walk about 4 blocks before she starts getting knee pain," but observed

that "[t]here is no evidence of any back pain with sciatica[5] and no evidence of radiating pain down the foot." Id. at 242. Along with other recommendations, Israelite advised the "avoidance of squatting and kneeling until symptomatic relief." Id.

On October 31, 2006, Dr. Ramsey evaluated Brown and recorded that she "presents with a two year history of pain localized to the left elbow" and "numbness or tingling in the small finger" that "is becoming more significant recently." Id. at 245. While Brown demonstrated "active elbow motion from 0-140 degrees of flexion with full forearm pronation and supination" and "good sensation to light touch throughout," she had tenderness and positive Tinel's[6] at the cubital tunnel, and "a positive elbow hyperflexion test at about 35 seconds . . . recreates numbness in the ulnar digits." Id. After a follow-up examination on April 10, 2007, Dr. Ramsey noted that an "MRI of

---

[5] Sciatica: "a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect, and most commonly caused by prolapse of the intervertebral disk; the term is also used to refer to pain anywhere along the course of the sciatic nerve." Richard Sloane, The Sloane Dorland Annotated Medical-Legal Dictionary 630 (1987 ed.)

[6] Tinel's sign: "a tingling sensation felt in the distal portion of a limb upon percussion of the skin over a regenerating nerve in the limb." Medline Plus Medical Dictionary, supra note 3.

the left shoulder demonstrates partial-thickness tear of the

supraspinatus"[7] and that Brown "has subdeltoid and subacromial[8]

fluid" and "[h]er AC [acromioclavicular][9] joint demonstrates

moderate to severe degenerative changes." Id. at 267. Moreover,

an "EMG nerve conduction report demonstrates a mild to moderately

severe left ulnar neuropathy in and about the elbow." Id.

Following another examination on February 6, 2007, though, Dr.

Ramsey observed that Brown's "right arm which has improved quite

nicely with therapy." Id. at 268. After these latter

examinations, Dr. Ramsey reported that Brown could actively

elevate the left shoulder to about 120 degrees and passively

---

[7] Supraspinatus: "a muscle at the back of the shoulder
that arises from the supraspinous fossa of the scapula, that
inserts into the top of the greater tubercle of the humerus, that
is one of the muscles making up the rotator cuff of the shoulder,
and that rotates the humerus laterally and helps to abduct the
arm." Medline Plus Medical Dictionary, supra note 3.

[8] Deltoid: "a large triangular muscle that covers the
shoulder joint, serves to raise the arm laterally, arises from
the upper anterior part of the outer third of the clavicle and
from the acromion and spine of the scapula, and is inserted into
the outer side of the middle of the shaft of the humerus."
Medline Plus Medical Dictionary, supra note 3. Acromion: "the
lateral extension of the spine of the scapula, projecting over
the shoulder joint and forming the highest point of the
shoulder." Sloane, supra note 5, at 8.

[9] Acromioclavicular: "pertaining to the acromion and
clavicle, especially to the articulation between the acromion and
clavicle." Sloane, supra note 5, at 8.

elevate the shoulder to 165 degrees with pain, while external rotation of the left shoulder was "to 45 degrees with good strength but discomfort." Id. at 267-68.

Dr. Yankelevich examined Brown on January 11, 2007, and reported that she claimed "tingling in right forearm radiating into ring and small fingers since about 2 or 3 years ago, of unknown cause," and "pains radiating from the left side of the neck into the left shoulder." Id. at 250. Nonetheless, Dr. Yankelevich's examination revealed full upper extremity range of motion, "with good dexterity and ability to oppose all fingers in both hands" and "normal sensory perception to pinprick, throughout," though grip strength in Brown's right hand (at 30 mm Hg) was significantly less than in her left hand (at 70 mm Hg). Id. at 252. Dr. Yankelevich further reported a decreased range of motion in Brown's left hip of 0 to 80 degrees, and in her left knee of 0 to 90 degrees, as well as an "[o]bvious Baker's cyst in the popliteal area of the right knee." Id. Dr. Yankelevich found Brown to have a full range of motion in her back and spine and noted that she was "[a]ble to get on and off the examination table and disrobe without difficulty." Id.

Dr. Downey saw Brown on November 28, 2006, February 13, 2007, and March 27, 2007, and reported her complaints of left

10

ankle pain, especially following prolonged activity and with weather changes, and pain and numbness in her right big toe. <u>Id.</u> at 262, 280. Dr. Downey observed bilateral contracted digits and edema in the left ankle, <u>id.</u> at 262, but also noted that

> Examination of the lower extremities revealed intact pedal pulses bilaterally. No edema, no erythema, and no signs of infection were noted. Ankle joint motion was symmetrical bilaterally with very minimal pain upon left ankle joint forced dorsiflexion. Otherwise no pain was noted with motion, and only mildly limited motion was noted bilaterally.

Id. at 280. Dr. Downey diagnosed mild to moderate osteoarthritis in the left ankle and mild right-sided weakness. <u>Id.</u> at 280-81.

Dr. Bozentka examined Brown on April 18, 2007, recording that "[s]he has paresthesias[10] in the ulnar nerve distribution" and "had an EMG/NCV on 3/5/07 which is consistent with mild to moderate severe left ulnar neuropathy," and that "[h]er symptoms have continued to progress despite nonoperative modalities." <u>Id.</u> at 266. Dr. Bozentka's examination revealed "positive Tinel's at the cubital tunnel and a positive elbow

---

[10] Paresthesia: "morbid or perverted sensation; an abnormal sensation, as burning, prickling, formication, etc." Sloane, <u>supra</u> note 5, at 533.

flexion compression test," as well as "no two-point discrimination[11] in the ring and small fingers." Id.

Dr. Rombeau operated on Brown "in February 2004 for perforated diverticulitis," and following a July 13, 2007 examination recalled that Brown's "postoperative course was reasonably good," though "[s]he had occasional lack of control of rectal function." Id. at 271. Brown complained at her examination of "left lower quadrant pain" occurring "one to two times weekly," but Dr. Rombeau's examination "revealed her to be in no acute distress" and left him "uncertain as to the etiology" of Brown's complaint, which was likely not due to diverticulitis but "may be due to intra-abdominal adhesions." Id. at 271-72.

Finally, Dr. Chandler examined Brown six times between July 24, 2006 and June 18, 2007, reporting right elbow neuropathy and pain in the left shoulder, right foot, and left knee. Id. at 283. Dr. Chandler observed severe degenerative joint disease ("DJD") in Brown's left knee requiring knee replacement. Id. at 286. On February 26, 2007, Dr. Chandler concluded that Brown would be temporarily disabled for twelve months or more beginning

---

[11] Discrimination: "the process by which two stimuli differing in some aspect are responded to differently." Medline Plus Medical Dictionary, supra note 3.

on July 24, 2004 as a consequence of her DJD, and that this
disability would preclude gainful employment.  Id. at 279.  Dr.
Chandler further diagnosed right elbow neuropathy and left
shoulder DJD as primary conditions, and left knee DJD and a
Baker's cyst as secondary conditions.  Id.

## II.  **Procedural History**

Under the Social Security Act one is considered to be
disabled "if he is unable to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than twelve months."  42 U.S.C. §
1382c(a)(3)(A).  Our Court of Appeals supplied a concise
explanation of the process whereby the Social Security
Administration determines whether someone is disabled in
Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005):

> [T]he Social Security Administration has
> promulgated regulations . . . that set out a
> sequential five-step analysis to guide its
> analysis (Reg. § 920).  In the first four
> steps the burden is on the claimant to show
> that she (1) is not currently engaged in
> gainful employment because she (2) is
> suffering from a severe impairment (3) that
> is listed in an appendix (or is equivalent to
> such a listed condition) or (4) that leaves

13

her lacking the RFC to return to her previous employment (Reg. §§ 920(a) to (e)).  If the claimant satisfies step 3, she is considered per se disabled.  If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform (Reg. § 920(f)).  Advisory testimony from a vocational expert is often sought by the ALJ for that purpose (<u>Plummer v. Apfel</u>, 186 F.3d 422, 428 (3d Cir. 1999)), and factors to be considered include medical impairments, age, education, work experience and RFC (<u>id.</u>; Reg. § 920(f)).

As already noted, Brown filed a claim for SSI benefits on July 6, 2006, which the State Agency denied on January 19, 2007 after concluding at step four of the above inquiry that Brown was capable of returning to her past relevant work as a fixed site office coordinator.  R. at 15, 68.  Brown then filed a timely request for a hearing before an ALJ on March 20, 2007, and the hearing was held on October 2, 2007.  <u>Id.</u> at 15.

At the hearing, in tandem with Brown's counsel, the ALJ elicited testimony from Brown regarding her work history, medical condition, and daily activities, the contents of which were recounted above.  A vocational expert, Maureen Brickley, testified as to the appropriate classification of Brown's past work under the Dictionary of Occupational Titles ("DOT"), suggesting that her work as a fixed site office coordinator

corresponded to the position of medical clerk, which was sedentary and semi-skilled work in the national economy with a Specific Vocational Preparation ("SVP") level of 4. Brown's security guard position involved light-duty and semi-skilled work in the national economy, with an SVP of 3. Her work as a gas station cashier was light-duty and unskilled, with an SVP of 2, in the national economy. Id. at 31. Brickley testified, however, that Brown worked as a medical clerk in a light capacity, as a security guard in a sedentary capacity, and as a gas station attendant in a sedentary capacity. Id. at 61-63.

The ALJ then posed three hypothetical questions to Brickley. In the first hypothetical, the ALJ asked if he "were to fully credit all of the claimant's testimony as offered here this morning," whether Brown could return to any of her past relevant jobs; Brickley responded no. Id. at 58. In the second hypothetical, the ALJ asked Brickley to assume that Brown could perform, "essentially, a full range of light work activity," as the State Agency had found on January 19, 2007, and Brickley explained that under these conditions, Brown "would be able to return to all of her past relevant jobs." Id. at 60. Finally, in the third hypothetical, the ALJ asked Brickley if Brown could return to any of her past relevant jobs if he assumed that

"the claimant could frequently lift and carry less than ten
pounds and occasionally a maximum of ten pounds.  Can stand and
walk for a total of two hours in an eight-hour workday, sit a
total of six hours in an eight-hour workday, and has no
limitations for fine or gross manipulation or feeling."  Id.
Brickley responded that Brown "could return, certainly, to the
gas station job, and the security guard job, and the medical
clerk job."  Id. at 63.  After stating that he would leave the
record open for one week, the ALJ closed the hearing.  Id. at 66.

    The ALJ issued his decision on November 30, 2007.  He
first noted that "Exhibit 18F from the Foot and Ankle Clinic was
submitted post-hearing, but no medical source statement from any
treating physician was received," id. at 73, and then commenced
the inquiry described in Rutherford.  At step one, the ALJ found
that Brown had "not engaged in substantial gainful activity (SGA)
since July 6, 2006"; at step two, he found that Brown had "the
following severe impairments: a history of bowel resection for
diverticulitis, degenerative arthritis of the left ankle,
degenerative joint disease of the right foot, and left (upper
extremity) ulnar neuropathy"; and at step three, he found that
Brown did "not have an impairment or combination of impairments

16

that meets or medically equals one of the listed impairments in

20 CFR Part 404, Subpart P, Appendix 1." _Id._ at 75-77.

In step four of his analysis, the ALJ concluded that

> the claimant has the residual functional
> capacity to perform the full range of
> sedentary work.  That is, she can frequently
> lift/carry less than 10 pounds and
> occasionally a maximum of 10 pounds; sit 6
> hours total in an 8-hour workday; stand/walk
> 2 hours total in an 8-hour workday; and she
> has no limitation for fine or gross
> manipulation or feeling with either upper
> extremity.

_Id._ at 77.  In arriving at this conclusion, the ALJ found that

> the claimant's medically determinable
> impairments could reasonably be expected to
> produce the alleged symptoms, but that the
> claimant's statements concerning the
> intensity, persistence and limiting effects
> of these symptoms are not entirely credible
> and would be compatible with an ability to
> perform a full range of sedentary work.

_Id._ at 79.  In reliance upon Brickley's testimony, the ALJ then

found that Brown's "residual functional capacity at the sedentary

exertional level still allows for the performance of her past

relevant work as a medical clerk, a security guard, and a gas

station cashier at the sedentary exertional level," _id._ at 81, so

that "the claimant is not disabled under section 1614(a)(3)(A) of

the Social Security Act."  _Id._

17

Brown requested review of the ALJ's decision, which the Appeals Council denied on December 23, 2008, id. at 5-7, and again on March 6, 2009 after the Appeals Council considered additional information. Id. at 1-4. As we have already elaborated, Brown then filed the present action against the Commissioner and later moved for summary judgment, which the Commissioner has opposed. On November 30, 2010, Magistrate Judge Restrepo recommended that Brown's motion for summary judgment be denied and that the Commissioner's final decision regarding her claim be affirmed. Brown timely filed objections to Judge Restrepo's recommendations.

## III. **Analysis**

Before considering Brown's arguments, we must first consider which of these arguments have been preserved through her objections.

The ALJ determined in his decision that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," R. at 79, and consequently determined that "the claimant has the residual

functional capacity to perform the full range of sedentary work."
Id. at 77.  In her motion for summary judgment, Brown asserted
that the Commissioner's final decision was deficient for three
reasons: "the ALJ discredited Ms. Brown's testimony without any
contrary medical evidence, failed to include all her relevant
exertional and non-exertional impairments in the RFC he assessed
for her and improperly concluded that two of Ms. Brown's jobs
were 'past relevant work.'"  Pl.'s MSJ Br. at 13.

        Brown's motion identified a variety of upper extremity,
lower extremity, and digestive impairments that the ALJ should
have credited and included in his RFC,[12] and suggests further
that the ALJ incorrectly failed to incorporate her limited
education, advanced age, and "non-exertional impairments" (such
as an inability to squat and kneel) into his RFC assessment.  Id.
at 10-11.  Even before Judge Restrepo rejected these arguments in
his report, Brown conceded in her reply to the Commissioner's
response that "[t]he ALJ's RFC arguably addresses Ms. Brown's

---

        [12] Brown argues that "she presented objective medical
evidence demonstrating left cubital neuropathy, degenerative
joint disease of the right foot and left knee, degenerative
arthritis of her left ankle and right elbow, osteoarthritis of
her left knee, a Baker's cyst in her right knee, left rotator
cuff tear, diverticulitis with a bowel resection, and right-sided
weakness."  Pl.'s MSJ Br. at 3.

lower extremity problems."  Pl.'s Reply to Def.'s Br. at 1.

After Judge Restrepo issued his Recommendation, moreover, Brown

only reiterated the first two arguments described above in her

objections, and those only in part: Brown claims that "the ALJ's

credibility finding is deficient" and that "[t]he RFC devised by

the ALJ is deficient because it incorrectly states that she has

no limitation in fine or gross manipulation or feeling with

either upper extremity, but this is contrary to the evidence."

Pl.'s Objections at 3.

Under 28 U.S.C. § 636(b)(1), "[a] judge of the court

shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which

objection is made."  Because Brown now appears to challenge only

the ALJ's failure to credit her upper extremity complaints and

include them in his RFC assessment, we will consequently limit

our review to examination of these claims.

**A.**    **Standard of Review**

42 U.S.C. § 405(g) provides that upon timely initiation

of a civil action seeking review of a final decision by the

Commissioner, a district court "shall have the power to enter,

upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing." Section 405(g) further provides that
"[t]he findings of the Commissioner of Social Security as to any
fact, if supported by substantial evidence, shall be conclusive."

"Substantial evidence" has been defined as "'more than
a mere scintilla. It means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.'" Smith v. Califano, 637 F.2d 968, 970 (3d Cir.
1981) (quoting Richardson v. Perales, 402 U.S. 389 (1971)). As
our Court of Appeals has explained, "[w]e will not set the
Commissioner's decision aside if it is supported by substantial
evidence, even if we would have decided the factual inquiry
differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir.
1999). Nonetheless, "the reviewing court has a duty to make a
searching investigation of the record in order to determine
whether the Secretary's decision is supported by substantial
evidence and whether it was made in accordance with the proper
legal standards." Capoferri v. Harris, 501 F. Supp. 32, 35 (E.D.
Pa. 1980). Moreover, "[a] single piece of evidence will not
satisfy the substantiality test if the Secretary ignores, or
fails to resolve, a conflict created by countervailing evidence."

21

<u>Kent v. Schweiker</u>, 710 F.2d 110, 114 (3d Cir. 1983). "Our scope

of review on matters of law is plenary." <u>Podedworny v. Harris</u>,

745 F.2d 210, 221 n.8 (3d Cir. 1984).

###    B.    **The ALJ's Credibility Finding**

In his decision denying Brown's claim for disability

benefits, the ALJ found "that the claimant's medically

determinable impairments could reasonably be expected to produce

the alleged symptoms, but that the claimant's statements

concerning the intensity, persistence and limiting effects of

these symptoms are not entirely credible and would be compatible

with an ability to perform a full range of sedentary work." R.

at 79. Brown now argues that "the ALJ's credibility finding is

deficient" because "[t]he ALJ recited Ms. Brown's testimony, but

he failed to discuss any of the [required] factors" under 20

C.F.R. § 404.1529, and likewise failed "to address the evidence

that is contrary to his finding." Pl.'s Objections at 3.

The ALJ's analysis adhered to the regulations'

framework, under which a plaintiff may not claim disability based

solely on subjective complaints such as pain or weakness. As 20

C.F.R. § 404.1529(b) provides,

> Your symptoms, such as pain, fatigue,
> shortness of breath, weakness, or

nervousness, will not be found to affect your
ability to do basic work activities unless
medical signs or laboratory findings show
that a medically determinable impairment(s)
is present.  Medical signs and laboratory
findings, established by medically acceptable
clinical or laboratory diagnostic techniques,
must show the existence of a medical
impairment(s) which results from anatomical,
physiological, or psychological abnormalities
and which could reasonably be expected to
produce the pain or other symptoms alleged.

Once objective medical evidence[13] shows that a claimant has "a

medically determinable impairment(s) that could reasonably be

expected to produce your symptoms, such as pain, we must then

evaluate the intensity and persistence of your symptoms so that

we can determine how your symptoms limit your capacity for work."

§ 404.1529(c)(1).  In performing this latter evaluation, an ALJ

is to consider not only objective medical evidence, but other

information as well.[14]  § 404.1529(c)(2)-(3).  A claimant's

---

[13] Section 404.1529 (c)(2) establishes an identity
between "[m]edical signs and laboratory findings, established by
medically acceptable clinical or laboratory diagnostic
techniques," and "objective medical evidence": "[o]bjective
medical evidence is evidence obtained from the application of
medically acceptable clinical and laboratory diagnostic
techniques, such as evidence of reduced joint motion, muscle
spasm, sensory deficit or motor disruption."

[14] This information includes: (1) daily activities; (2)
the location, duration, frequency, and intensity of pain or other
symptoms; (3) precipitating and aggravating factors; (4) the
(continued...)

"symptoms, including pain, will be determined to diminish your

capacity for basic work activities to the extent that your

alleged functional limitations and restrictions due to symptoms,

such as pain, can reasonably be accepted as consistent with the

objective medical evidence and other evidence." § 404.1529(c)(4).

As our Court of Appeals has explained, a reviewing

court should "ordinarily defer to an ALJ's credibility

determination because he or she has the opportunity at a hearing

to assess a witness's demeanor." Reefer v. Barnhart, 326 F.3d

376, 380 (3d Cir. 2003). At the same time, "[w]hen making

credibility findings, the ALJ must indicate which evidence he

rejects and which he relies upon as the basis for his findings."

Salles v. Comm'r of Soc. Sec, 229 Fed. Appx. 140, 146 (3d Cir.

2007). In a sense, this is an application of the general

principle that "an administrative decision should be accompanied

---

[14] (...continued)
type, dosage, effectiveness, and side effects of any medication
you take or have taken to alleviate your pain or other symptoms;
(5) treatment, other than medication, a claimant receives or has
received for relief of pain or other symptoms; (6) any measures a
claimant uses or has used to relieve pain or other symptoms (such
as lying flat, standing for a few minutes every hours, sleeping
on a board, etc.); and (7) other factors concerning a claimant's
functional limitations and restrictions due to pain or other
symptoms. § 404.1529(c)(3).

by a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).

An ALJ's findings regarding a claimant's subjective complaints are similarly circumscribed by a reason-giving requirement: "an ALJ has the prerogative to reject such allegations [of subjective complaints] in their entirety, as long as he explicitly states his reasons for doing so." <u>Capoferri</u>, 501 F. Supp. at 39. And an ALJ must give significant weight to a claimant's complaints. "[E]ven where an individual's subjective complaints of paint are not supported by medical evidence, they are entitled to serious consideration," <u>Wilson v. Apfel</u>, 1999 WL 993723, at *3 (E.D. Pa. 1999), and "testimony of subjective pain and inability to perform light work should be accorded great weight . . . when it is supported by competent evidence." <u>Podedworny v. Harris</u>, 745 F.2d 210, 217 (3d Cir. 1984). Moreover, "[w]here medical evidence does support a claimant's complaints of pain, the complaints . . . may not be disregarded unless there exists contrary medical evidence." <u>Mason v. Shalala</u>, 994 F.2d 1058, 1067-68 (3d Cir. 1993). Our Court of Appeals has thus summarized its standard regarding subjective pain as requiring

(1) that subjective complaints of pain be
seriously considered, even where not fully
confirmed by objective medical evidence; (2)
that subjective pain may support a claim for
disability benefits, and may be disabling;
(3) that where such complaints are supported
by medical evidence, they should be given
great weight; and (4) that where a claimant's
testimony as to pain is reasonably supported
by medical evidence, the ALJ may not discount
claimant's pain without contrary medical
evidence.

<u>Green v. Schweiker</u>, 749 F.2d 1066, 1068 (3d Cir. 1984).

In his decision, the ALJ explicitly found that "the
claimant's medically determinable impairments could reasonably be
expected to produce the alleged symptoms." R. at 79. He then
found, however, "that the claimant's statements concerning the
intensity, persistence and limiting effects of these symptoms are
not entirely credible and would be compatible with an ability to
perform a full range of sedentary work," <u>id.</u>, and supported this
finding with four explanatory statements. First, he asserted
that "[t]he medical evidence, including the physical findings and
objective testing, supports a conclusion that claimant can
perform at a full range of sedentary work." <u>Id.</u> Second, he
observed that "[n]o treating physician has offered a medical
source statement assessing the claimant's specific functional
limitations." <u>Id.</u> Third, he noted -- with respect to Dr.

Chandler's March 6, 2007 assessment that Brown was temporarily disabled -- that "such opinions on 'disability' for purposes of the Department of Public Assistance are not controlling within the meaning and scope of SSR 96-2p." Id. at 80. And fourth, the ALJ explained that he had "considered the claimant's own subjective allegations and have found them not fully credible in light of the lack of support within the medical record. In evaluating the claimant's testimony, I find that, despite her pain complaints, there is insufficient medical evidence to establish disability." Id.

It is unclear, from the ALJ's decision, in what respect "there is insufficient medical evidence to establish disability." Id. It is well-established that "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." Soc. Sec. Ruling 96-7p (1996) (emphasis in original). See also Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984) ("[D]ismissal of subjective symptomology on the basis of an absence of direct medical evidence is at odds with the Third Circuit standard, the new statute, and the Secretary's own regulations."); Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("[O]bjective medical

proof of each and every element of pain is not required.");

Rutherford, 399 F.3d at 554 ("[An ALJ] should not reject a

claimed symptom that is related to an impairment and is

consistent with the medical record simply because there is no

objective medical evidence to support it.").  If the ALJ chose

not to credit Brown's subjective complaints due to a lack of

objective medical support, then, he was in error.

    If we instead choose to interpret the ALJ's terse

statements more charitably as referring to a paucity of any

support for Brown's subjective complaints in the medical record,

we encounter other difficulties.  To begin, our Court of Appeals

has observed that "[i]t would not seem appropriate to construe a

physician's silence as to a patient's pain as an affirmative

statement that the patient is not in pain."  Mason, 994 F.2d at

1068 n.15.  Moreover, the record reveals that Brown reported

complaints of pain to almost every one of her physicians, R. at

242-43 (Dr. Israelite), 245, 267-68 (Dr. Ramsey), 250 (Dr.

Yankelevich), 261-62 (Dr. Downey), 271-72 (Dr. Rombeau), 282-87

(Dr. Chandler), with only Dr. Bozentka's records omitting to

mention a self-report of pain.  Id. at 266.  Furthermore, reports

from Drs. Ramsey, id. at 267-68, and Yankelevich, id. at 252,

documented a decreased upper-body range of movement on Brown's

part.  It does not appear, then, that the ALJ could have

concluded that Brown's medical record contained no subjective

evidence of pain or limitations on movement.

In sum, the ALJ failed to "explicitly state[]" valid

reasons for exercising his "prerogative to reject" Brown's

allegations of subjective complaints.  Capoferri, 501 F. Supp. at

39.  The Commissioner contends that "based on the record as a

whole, and the ALJ's thorough discussion of it, Brown's assertion

that the ALJ dismissed the evidence is without merit," Def.'s Br.

in Resp. to Pl.'s Mot. Summ. J. ("Def.'s Br.") at 8, asserting

that the ALJ "thoroughly considered Brown's orthopedic

complaints," id. at 10, and "carefully considered Brown's

subjective limitations in comparison to the medical record as a

whole."  Id. at 12.  We certainly recognize that the ALJ's

decision included a detailed review of the medical records Brown

submitted, R. at 75-76, as well as of the testimony Brown

presented at her hearing, id. at 78-79.  In short, the ALJ

thoroughly examined the record.  But in the absence of some valid

explanation linking the ALJ's credibility finding to evidence

found in the record, we cannot agree that the ALJ "carefully

considered Brown's subjective limitations in comparison to the

medical record."  Def.'s Br. at 12.  Because the ALJ did not

offer valid _reasons_ supporting his credibility finding, his finding was not supported by substantial evidence.

The Commissioner offers an array of _post hoc_ justifications for the ALJ's credibility finding in his response to Brown's motion for summary judgment. With respect to Brown's subjective complaints regarding her upper and lower extremities, the Commissioner asserts that these complaints were incredible because "Brown underwent all of her orthopedic evaluations only after she filed for SSI in July 2006," and "despite Brown's representations that she underwent physical therapy and multiple injections, there was no record of any therapy." _Id._ at 10 (citation omitted). While an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints," "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." Soc. Sec. Ruling 96-7p (1996). Thus, "[t]he adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment." _Id._ This injunction, when coupled

with an ALJ's general "duty to develop a full and fair record in social security cases," Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995), suggests that if the ALJ intended to rely on Brown's failure to seek treatment in making his credibility finding, he should have given Brown the opportunity at her hearing to explain why she did not seek treatment for her orthopedic complaints earlier. Oddly, the ALJ did not pursue this line of inquiry.

The Commissioner also argues that the medical evidence contradicts Brown's account of her complaints, since

> Brown's physical examinations since claiming disability in 2006, revealed that she had full range of motion of the upper extremities, nearly full range of motion of the lower extremities, and full range of motion of the spine. More specifically, her lower extremities had intact pedal pulses, no edema, no erythema, no infection, and ankle joint motion that was symmetrical, bilaterally, resulting in very minimal pain. Dr. Yankelevich's consultative examination specified that Brown was able to get on and off of the examining table and disrobe without difficulty.

Def.'s Br. at 11-12. As our lengthy review of Brown's physical examinations makes clear, the records submitted by Brown's doctors were anything but unambiguous with respect to Brown's upper extremity limitations. Dr. Yankelevich's examination did reveal full upper extremity range of motion and full range of

motion in Brown's back and spine.  R. at 252.  Dr. Yankelevich

also found that Brown was able "to get on and off the examination

table and disrobe without difficulty."  Id.

But Brown's other doctors found partial thickness tear

of the supraspinatus and moderate to severe changes in Brown's

acromioclavicular joint, id. at 267 (Dr. Ramsey), limited upper

body range of motion, id. at 267-68 (Dr. Ramsey), and

degenerative joint disease in Brown's left shoulder.  Id. at 279

(Dr. Chandler).  We do not suggest that the evidence the

Commissioner cites is necessarily not substantial, or that "it is

overwhelmed by other evidence."  Kent, 710 F.2d 110, 114 (3d Cir.

1983).  The ALJ cannot choose to credit this evidence over

countervailing evidence without explaining why he did so.  As our

Court of Appeals has taught, "[w]hile the ALJ is, of course, not

bound to accept physicians' conclusions, he may not reject them

unless he first weighs them against other relevant evidence and

explains why certain evidence has been accepted and why other

evidence has been rejected."  Id. at 115 n.5.  In the absence of

such an explanation, the ALJ's decision would not have been

supported by substantial evidence even if he had cited the

evidence the Commissioner identified.

Finally, the Commissioner supplies an assortment of arguments aimed directly at Brown's credibility. First, he argues that Brown's account suffers from contradictions since "despite Brown's representations that she was prescribed braces, a cane, and had side effects from powerful narcotic pain medications 'through-out her treatment,' the record revealed the contrary," Def.'s Br. at 10 (citation omitted), and "Brown then contradicted herself by telling the ALJ that she last worked in 2004, the year that she began to receive public assistance cash benefits." Id. at 9. While an ALJ is to "consider whether there are any inconsistencies in the evidence" in evaluating a claimant's subjective complaints, 20 C.F.R. § 404.1529(c)(4), the above "contradictions" seem minor to us and we cannot imagine that they played an important role in the ALJ's decision.

The Commissioner also asserts that "the ALJ considered Brown's testimony regarding her daily activities, including the fact that she has a boyfriend who is disabled, and whom she sees two-to-three times a week." Def.'s Br. at 13-14. When an ALJ finds that a plaintiff's "claimed limitations . . . were contradicted by her own testimony and level of activity," this is certainly a "legitimate basis for discounting her credibility." Salles, 229 Fed. Appx. at 147. But as with much of the other

evidence in the record, the ALJ reviewed this testimony without explicitly linking it to his credibility finding, and where an ALJ's credibility finding appears to rest on "uncertain inferences" from a claimant's testimony -- for example, where an ALJ does "not explain what aspect of appellant's daily routine persuaded him to believe that appellant could sit for longer than he professed he could" -- it is not deemed to be supported by substantial evidence. Mason, 994 F.2d at 1066. More fundamentally, Brown testified that she sleeps thirteen hours a day, does no household chores, sits or lies down all day, attends church once every three months, and visits her boyfriend a few times a week, though they only sit together and watch movies. R. at 35-43. It is unclear what aspect of this account could suggest that Brown has the capacity to "sit 6 hours total in an 8-hour workday" and "stand/walk 2 hours total in an 8-hour workday," R. at 77, as the ALJ concluded. The law teaches that we should not be too eager to conclude that a claimant's subjective complaints are incredible because she partakes in limited daily activities; "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." Smith, 637 F.2d at 971.

Because the ALJ did not justify his credibility finding with a valid, reasoned explanation, it is consequently not supported by substantial evidence. Even if we consider the Commissioner's _esprit de l'escalier_ that furnishes explanations for the ALJ's credibility finding that the ALJ himself did not think to include in his decision, the Commissioner's arguments nonetheless fail to demonstrate that substantial evidence supported the ALJ's decision.

A remand is thus appropriate.

### C.   **The ALJ's RFC Determination**

At step four of his analysis, the ALJ found

> that the claimant has the residual functional capacity to perform the full range of sedentary work. That is, she can frequently lift/carry less than 10 pounds and occasionally a maximum of 10 pounds; sit 6 hours total in an 8-hour workday; stand/walk 2 hours total in an 8-hour workday; and she has no limitation for fine or gross manipulation or feeling with either upper extremity.

R. at 77. Brown argues that "[t]he RFC devised by the ALJ is deficient because it incorrectly states that she has no limitation in fine or gross manipulation or feeling with either upper extremity, but this is contrary to the evidence that

reveals as indicated in Ms. Brown's underlying briefs."  Pl.'s
Objections at 3.

As the Commissioner correctly notes, "an attack on an
ALJ's hypothetical question is generally an attack on the ALJ's
residual functional capacity (RFC) assessment," Def.'s Br. at 15
n.5 (citing Rutherford, 399 F.3d at 554 n.8).  Thus, we may
consider at the same time the adequacy of the ALJ's RFC
assessment and his hypothetical question to Brickley, the
vocational expert.  Our Court of Appeals has explained that "[a]
hypothetical question must reflect all of a claimant's
impairments that are supported by the record; otherwise the
question is deficient and the expert's answer to it cannot be
considered substantial evidence."  Chrupcala v. Heckler, 829 F.2d
1269, 1276 (3d Cir. 1987).  In Rutherford, 399 F.3d at 554
(quotation marks and citations omitted), our Court of Appeals
summarized the guidelines that govern whether a limitation has
been credibly established:

> Limitations that are medically supported and
> otherwise uncontroverted in the record, but
> that are not included in the hypothetical
> question posed to the expert, preclude
> reliance on the expert's response.
> Relatedly, the ALJ may not substitute his or
> her own expertise to refute such record
> evidence.  Limitations that are medically
> supported but are also contradicted by other

> evidence in the record may or may not be
> found credible -- the ALJ can choose to
> credit portions of the existing evidence but
> cannot reject evidence for no reason or for
> the wrong reason.  Finally, limitations that
> are asserted by the claimant but that lack
> objective medical support may possibly be
> considered nonetheless credible.

Brown suggests that the ALJ's RFC assessment and hypothetical to Brickley were deficient because they failed to include the partial thickness tear of the supraspinatus in her left shoulder, moderate to severe degenerative changes of her left AC joint, mild to moderately severe left ulnar neuropathy, restricted range of motion of her shoulder, decreased grip strength in her right hand, and problems with reaching and numbness in her left arm.  Pl.'s Objections at 3-4.  Of these claims, we need not even consider whether Brown credibly established "mild to moderately severe left ulnar neuropathy," id., because the ALJ, in his decision, concluded that this condition constituted a _severe_ impairment.  R. at 75.  This finding cannot be reconciled with the ALJ's conclusion in his RFC assessment that Brown had "no limitation for fine or gross manipulation or feeling with either upper extremity."  _Id._ at 77. For this reason alone, the ALJ's RFC assessment and hypothetical to Brickley were deficient, and remand is hence doubly warranted.

Turning to Brown's other claimed upper body
impairments, the Commissioner now offers rationalizations of the
ALJ's decision to omit Brown's alleged upper extremity
impairments from his RFC assessment, as he did with respect to
the ALJ's credibility finding.  The Commissioner contends that
"Brown was found to have good dexterity and ability to oppose all
fingers in both hands with no swelling or redness; Brown's right
arm improved quite nicely with treatment," Def.'s Br. at 16
(citing R. at 252, 268), and that Brown's left ulnar neuropathy
might be treatable.  Id. at 16-17.  Without examining Brown's
claimed limitations in detail, we note only that each of her
claims finds at least some support in the medical record.  As our
Court of Appeals has warned, "[a]n ALJ may not simply ignore the
opinion of a competent, informed, treating physician.  And a
finding of residual capacity for work which conflicts with such
an opinion and is made without analytical comment or record
reference to contradictory evidence is not supported by
substantial evidence."  Gilliland v. Heckler, 786 F.2d 178, 183
(3d Cir. 1986) (internal citations omitted).  As we have already
explained at length, the ALJ's decision did not specify which
doctors' conclusions he favored, much less why he favored these
conclusions over contrary items of evidence.  Without such an

explanation, the ALJ's RFC assessment and hypothetical would not have been supported by substantial evidence, even if they had included some mention of Brown's left upper extremity ulnar neuropathy.  The Commissioner's identification of elements of the record that support the ALJ's RFC assessment cannot cure this defect, and a remand is hence appropriate.

BY THE COURT:

__\s\Stewart Dalzell